**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**EXPRESS OIL CHANGE, LLC. et al.**                                    **PLAINTIFF**

**VS**                                    **CIVIL ACTION NO.: 3:16-cv-414-HTW-LRA**

**MISSISSIPPI BOARD OF LICENSURE**
**FOR PROFESSIONAL ENGINEERS & SURVEYORS**                    **DEFENDANT**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Statutory and  Factual Background

The State of Mississippi has enacted statutes regulating the practice of engineering and the use of the term "engineer" in business names. The announced sainted purpose underscoring these statutes is "to safeguard life, health, and property, and to promote the public welfare." Miss. Code Ann. §73-13-1. Obedient to this concern, the Mississippi Legislature has prohibited any person or businesses from using the term "engineer" in a commercial identification, title, or name, unless the proponent is licensed to perform engineering services by the Mississippi Board of Licensure for Professional Engineers and Surveyors. Miss. Code. Ann. §§ 73-13-1; 73-13-39.

This statutory approach dates back to at least 1928, a date occurring well before Plaintiffs Express Oil Change, LLC, and TE, LLC d/b/a Tire Engineers (collectively "EOC") first purchased a Mississippi store. At the nascent of this litigation, EOC owned approximately nine stores in Mississippi. These stores served as tire sale and customer service centers where customers could bring their automobiles for repairs and routine maintenance.

In 2015, EOC undertook to change the name of the tire sale and service centers it

1

owned in Mississippi to "Tire Engineers." EOC also began purchasing other existing tire sale and service centers in Mississippi and changing their names, too, to "Tire Engineers." EOC's website contemporaneously began to advertise that "Tire Engineers have tire engineers who are qualified" to perform tire-related services for customers' vehicles. [See EOC Website at BOE223 (Dkt. 22-1); Proposed Pretrial Order Stipulation No. 8, Exhibit 9 to Supplement (Dkt No. 48)].

In February 2015, the Mississippi Board of Licensure for Professional Engineers and Surveyors (the "Board")[1] notified EOC that its use of the name "Tire Engineers" violated Code Section 73-13-39[2]. [Amended Complaint p.2 (Dkt No. 8)].

Thereafter, EOC and the Board met in a series of meetings to determine if a meeting of the minds could be effectuated. The parties also exchanged relevant correspondence. Neither side budged; neither was willing to abandon its position.

EOC thereafter filed this lawsuit, to which the Board takes exception. In this lawsuit, EOC seeks a declaratory judgment and related relief based on three contentions: first, EOC says that the Board has misinterpreted its governing statutes when it concluded that the business name "Tire Engineers" violates Code Section 73-13-39; secondly, EOC asserts that the Board's prohibition of EOC's use of the business name, "Tire Engineers", infringes upon EOC's commercial free speech rights protected by the First Amendment[3]; thirdly,

---

[1]The complaint names as defendants the members of the Mississippi Board of Licensure for Professional Engineers and Surveyors in their official capacity. For clarity, the Court will refer to the defendants as the Board.

[2] Miss. Code Ann. §73-13-39: Unless licensed in accordance with the provisions of Sections 73-13-1 through 73-13-45, no person shall: (a) Directly or indirectly employ, use, cause to be used or make use of any of the following terms or any combinations, variations or abbreviations thereof as a professional, business or commercial identification, title, name, representation, claim, asset or means of advantage or benefit: "engineer," "professional engineer," "licensed engineer," "registered engineer," "registered professional engineer," "licensed professional engineer," "engineered," "engineering". . .

[3] The First Amendment to the United States Constitution guarantees, "Congress shall make no law

2

EOC proclaims that the preemptive declarations of the Lanham Trademark Act[4] prevent the State of Mississippi from pursuing their course of action.

The parties filed cross-motions for summary judgment at the close of the discovery period. In addition, EOC filed a motion in limine to exclude the testimony of the Board's expert witness, Jerry Lindsley. The Board has responded by filing a motion to strike a portion of the summary judgment affidavit of Josh Henderson submitted by EOC.

This Court has conducted a public hearing on these motions, whereat all parties were represented and permitted to participate in oral argument. This Court now is prepared to rule on all of the outstanding motions.

### EOC's Motion In Limine to Exclude the
### Expert Testimony of John Lindsley

EOC filed a motion in limine to exclude testimony from the Board's expert witness Jerry Lindsley based on *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Fed. R. Evid. 702. Rule 702 provides that a witness qualified as an expert "by knowledge, skill, experience, training, or education" may give opinion testimony if such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed R. Evid. 702. Rule 702 has been interpreted to contain two basic requirements: (1) that the testimony be helpful (i.e., relevant); and (2) that the testimony

---

respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
U.S. Const. Amend. I.

[4] The purpose of the Lanham Act is to provide national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers (*Park 'N' Fly Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)(citing S.Rep. No. 1333, at 3, 5)).

be based upon reliable methodologies. *Daubert*, 509 U.S. at 596; *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) ("It goes without saying that Daubert clarified a district court's gate-keeping function: the court must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case.").

At issue is a public opinion survey performed by Board witness Jerry Lindsley. Public opinion surveys are commonly used in commercial speech disputes. See *Simm v. Louisiana State Bd. of Dentistry*, No. CIV.A. 01-2608, 2002 WL 257688, at *5 (E.D. La. Feb. 22, 2002), aff'd, 57 F. App'x 212 (5th Cir. 2003)(Defendants' use of telephone survey provided evidence that advertisements were potentially misleading); *Pub. Citizen Inc. v. Louisiana Attorney Disciplinary Bd.*, 632 F.3d 212, 225 (5th Cir. 2011)(use of telephone surveys and focus groups provided evidence that advertisements were implicitly misleading); cf. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 652–53 (1985)(public survey showed that general public was often unaware of technical terms such as "fees" and "transactions" used in advertising).

The survey at the core of this battle of admissibility purports to be a scientific and professional public opinion poll of Mississippi consumers. Championing its admissibility, the Board explains that in January of 2017, it commissioned Jackson State University's Institute of Government[5], with its partner the Center for Research and Public

---

[5] The Institute of Government at Jackson State University is an affiliated program through the College of Public Service that advances small to mid-size urban regions through problem solving and opportunities for growth, development and community sustainability. http://www.jsums.edu/instituteofgovernment/

Policy, Inc.[6], to conduct between January 6-19, 2017 a telephonic public opinion poll of 400 Mississippi respondents. [Summary Judgment Exhibit K (Dkt. 22-11)] The assigned task was to determine whether Mississippians were being misled by EOC's use of the business name "Tire Engineers." The "poll supposedly was designed to assess public views, expectations, perceptions and anticipated skill levels associated with" Tire Engineers as a business in Mississippi. The Board designated Jerry Lindsley, the president of the Center for Research and Public Policy, Inc., (the "Center") as its testifying expert. The Center is a national research firm that performs public opinion polling for businesses and governmental entities. Lindsley has served as president of the Center since its inception in 1979. EOC does not question the qualifications of Lindsley, the methodology of the survey, or the calculation of the results.

EOC, nevertheless, campaigns for the exclusion of the report. EOC contends that the expert testimony must be excluded in its entirety because: (1) the survey questions were leading and suggestive, (2) the survey did not show respondents a photograph of Tire Engineers "signage and physical location," and (3) the survey was designed by the Board's attorneys.

Having reviewed the arguments carefully and conducted a hearing on the matter, the Court finds that the motion in limine to exclude the expert testimony must be denied. The Court's reasoning follows.

The general rule is that alleged technical deficiencies affect a survey's weight and not its admissibility. See *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1055 n.10 (5th Cir. 1981) ("[i]f the inadequacies in the survey had been technical,

---

[6] The Center for Research & Public Policy is a full-service consulting firm specializing in survey research and public opinion polling. http://www.crpp.com/

such as the format of the question or the manner in which . . . the survey was taken, those shortcomings would have borne on the weight of the evidence, not its admissibility"). "Quibbles" over the language of a survey used in commercial speech cases do not affect the survey's admissibility. *Simm*, 2002 WL 257688, at *6.

This guiding jurisprudence does not condemn the survey at issue to the gallows. For instance, EOC specifically criticizes the following question as "leading or suggestive": "Q2. By using the name 'Tire Engineers', the company is suggesting it has professional engineers on its staff." Those participating in the survey were asked to answer that question by choosing: Strongly Agree; Somewhat Agree; Somewhat Disagree; Strongly Disagree; Unsure. This court does not view questions of this type as improper or suggestive.

Survey participants were given a choice of answers ranging from "agree" to "disagree". Participants were also given "unsure" as a potential response, so as not to force or lead participants into any response at all. In sum, questions of this type are not inappropriate "because they do not suggest an answer." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 129 F. Supp. 2d 351, 365 (D.N.J. 2000), aff'd, 290 F.3d 578 (3d Cir. 2002) (citing *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir.1997) ("It is elementary that a leading question is one that suggests an answer")).

Secondly, EOC contends that the survey results are skewed because the telephonic survey did not show respondents a photograph of Tire Engineers' "signage and physical location." EOC speculates that the survey results would have been different, and respondents would have not equated Tire Engineers with actual tire

engineers, had respondents been polled in a face-to-face method which included a photograph of a Tire Engineers' location[7].

EOC calls upon *Exxon Corp. v. Texas Motor Exchange of Houston, Inc*., 628 F.2d 500 (5th Cir. 1980) for authoritative help. In this case, public surveys were used to measure whether two trademarks were deceptively similar in their visual presentations. There, the visual presentations had vitality because the "Exxon" trademark represented Plaintiff Exxon Corporation, which is a large producer of petroleum products, while Defendant's "Tex-On" trademark represented automotive repair services on transmissions and engines. *Id*. at 505.

At oral argument *sub judice*, counsel for EOC provided this Court with a photograph it argued that had it been shown to the respondents may have changed their answers. [Exhibit 1 to Board Supplement, (Dkt 48-1)] The photograph was of a gray and blue building with seven white service bays. The only lettering visible on the picture stated "Tire Engineers."

This Court fails to see how the survey's failure to show respondents that photograph or a similar photograph skewed the results of the survey and requires exclusion. Further, EOC has not submitted any competing expert testimony in support

---

[7] Survey participants were informed that the survey pertained to a company named "Tire Engineers" which provided tire services such as sales, tire rotation, wheel balancing, alignments, and tire repair. [See Exhibit K at 30, 31 Dkt. No. 22-11]. Almost half of the respondents (47.8%) believed that a company that uses the name "Tire Engineers" performs engineering services for tires. When asked "Do you expect and believe that a company which calls itself 'Tire Engineers' would have licensed professional engineers performing services for you and the public?" – 58.8% said yes. A majority of respondents (70.5%) strongly agreed or somewhat agreed that by using the name "Tire Engineers" the company is suggesting it has professional engineers on its staff. A majority of respondents (52.3% ) strongly agreed or somewhat agreed that by using the name "Tire Engineers" the company is suggesting the work on a vehicle is done by engineers. A majority of respondents (61.5%) strongly agreed or somewhat agreed that by using the name "Tire Engineers" the company is suggesting the company utilizes engineers to provide services to its customers. A majority of respondents (57.3%) strongly agreed or somewhat agreed that by using the name "Tire Engineers" the company is suggesting it is legally qualified to engage in the practice of engineering.

of its surmise. EOC has but advanced a naked theory, which to appear above speculation, should have been clothed by evidentiary or "plainly evident" garments.

Thirdly, EOC contends that the survey must be excluded in its entirety because it was designed by the Board's attorneys. This alleged criticism, even if true, alone, is not a fatal dose of arsenic. As observed in *Icon Enterprises Int'l, Inc. v. Am. Prod. Co*., No. CV 04-1240 SVW PLAX, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004), unless the participation of the Board or its attorneys resulted in a survey which is flawed, such participation in and of itself does not impact the reliability or relevance of the expert's work.

EOC does not contend that Lindsley failed to utilize his judgment and expertise in survey design when reviewing and editing any questions suggested by the Board and its counsel. It is axiomatic that "[a]ttorney cooperation with the survey professional in designing the survey is essential to produce relevant and useable data. If attorneys cannot tell the survey director what the relevant legal issues are and assist the director in framing relevant questions to be directed at a relevant universe, then irrelevant survey data are bound to be the result. The only relevant limitation is that the attorneys do not conduct the survey." *Id.* at 26. EOC does not contend that the Board's attorney participated in the conduct of the survey.

The Court thus denies EOC's motion in limine to exclude the expert testimony of Jerry Lindsley, and his use and interpretation of the survey.

<u>The  Board's Motion to Strike Portions of  Josh
Henderson's Summary Judgment Affidavit.</u>

The Board has filed a motion to strike portions of the affidavit of Josh Henderson

submitted by EOC in connection with the summary judgment briefing. Henderson is an official with EOC and was not designated as an expert witness by any party. The Board argues that paragraphs nine and ten of Henderson's affidavit contain testimony that is not competent summary judgment evidence under Rule 56(c) and is improper expert testimony from an undisclosed expert. The Court finds that the motion should be granted to the extent explained below.

The Board contends that Henderson's affidavit testimony is inappropriate in two ways: first, Henderson's testimony that consumers are not misled by the "Tire Engineers" business name is testimony about the mental impressions of Mississippi consumers which is inappropriate lay witness testimony and which separately lacked an evidentiary foundation in the affidavit. A "[m]eaningful opinion about consumer impressions requires some scientific, technical, or statistical basis in fact." *Tyco Healthcare Grp. LP v. Kimberly-Clark Corp.*, 463 F. Supp. 2d 127, 131 (D. Mass. 2006) (finding that "[l]ay opinion of consumers' mental impressions is problematic;" striking statements from affidavit); see also *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254–55 (9th Cir. 1982) (citing Fed. R. Evid. 701). At oral argument, EOC conceded that testimony from Henderson regarding the mental impressions of Mississippi consumers would be inappropriate and inadmissible. Accordingly, the Court will disregard any such testimony.

Secondly, the Board contends that Henderson's testimony that EOC is "not aware of any instance" in which a Mississippi consumer "believed or was under the impression that Tire Engineers provided or offered to provide professional engineering services" lacked a proper evidentiary foundation in the affidavit and was otherwise

9

inappropriate lay testimony regarding consumer impressions. At oral argument, EOC explained that Henderson's testimony is limited to the assertion that EOC has not received a complaint from a Mississippi consumer in which the consumer thought EOC employed engineers or provided engineering services. The Court will limit the interpretation of Henderson's summary judgment affidavit accordingly.

## The Parties' Cross Motions for Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). When considering a motion for summary judgment, a "district court has somewhat greater discretion to consider what weight it will accord the evidence in a bench trial than in a jury trial." *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991). Where "the evidentiary facts are not disputed, a court in a nonjury case may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978). When deciding a motion for summary judgment prior to a bench trial, the district court "has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) (quoting *Placid Oil*)[8].

---

[8] According to the proposed pretrial order, EOC's summary judgment evidence is materially the same as it would present at the bench trial, consisting mostly of one fact witness (an EOC employee) whose affidavit was submitted with the summary judgment motion and exhibits attached to the Amended Complaint [Dkt. No. 8]. [Proposed Pretrial Order, Exhibit 9 to Supplement (Dkt 48)].

<u>The Board is Entitled to Summary Judgment on EOC's Request for a
Declaratory Judgment That Its Business Names Do Not Violate
Mississippi Statutory Law.</u>

The Amended Complaint seeks a declaration that "Tire Engineers' use of 'Engineers' in its trade name does not violate Mississippi Code §§ 73-13-1 through 73-13-45." [Amended Complaint at 11 (Dkt No. 8)]. EOC appears to ask this Court to declare that the Board misinterpreted or misapplied Mississippi law when it determined that EOC was violating the statutory restrictions on the use of the term "engineer" by non-engineers.

This argument fails as a matter of law. Such declaratory relief is barred by the Eleventh Amendment[9] as confirmed in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.") And, in the alternative, Mississippi Code Section 73-13-39 states that "[u]nless licensed" by the Board, "no person shall: (a) Directly or indirectly employ, use, [. . .] any of the following terms or any combinations, variations or abbreviations thereof as a professional, business or commercial identification, title, name, representation, claim, asset or means of advantage or benefit: 'engineer,' . . . ." All parties agree that EOC is not licensed by the Board and does not employ anyone licensed by the Board. The Board's conclusion that this statutory language prohibits EOC from using the business name "Tire Engineers" is supported by an official opinion of the Mississippi

---

[9] The Eleventh Amendment to the United States Constitution states: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI

Attorney General's Office which reached the same conclusion.  *See Humphreys Op.*, 2015 WL 9851408, at *1 (Miss. A.G. Dec. 28, 2015).

<u>The  Board is Entitled to Summary Judgment on  EOC's First Amendment Commercial Speech Claim.</u>

"[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 563 (1980). For purposes of the First Amendment challenge, the State has the burden to establish the legality of the restriction. Id. at 570. Whether commercial speech is misleading may be resolved on summary judgment. See *Peel v. Attorney Disciplinary Commission,* 496 U.S. 91, 108 (1990) (whether speech is "inherently misleading" is a question of law) (plurality opinion); *Pub. Citizen Inc. v. Louisiana Attorney Disciplinary Bd.*, 632 F.3d 212, 224-226 (5th Cir. 2011) (affirming in part summary judgment finding commercial speech to be misleading); *Simm v. Louisiana State Bd. of Dentistry*, 2002 WL 257688, at *5-6 (E.D. La. Feb. 22, 2002), aff'd, 57 F. App'x 212 (5th Cir. 2003) (granting summary judgment and relying on public opinion poll to establish commercial speech as potentially misleading).

The Supreme Court's decision in *Central Hudson* is the starting point for EOC's claim to protected commercial speech.

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and

whether it is not more extensive than is necessary to serve that interest. *Central Hudson*, 447 U.S. at 566. In application, the Central Hudson test is divided into three branches: (1) inherently misleading which is entitled to no First Amendment protection, (2) actually misleading commercial speech which is entitled to no First Amendment protection, and (3) potentially misleading commercial speech which is entitled to limited First Amendment protection.

Commercial speech, especially in the area of "advertising for professional services," which is inherently misleading or actually misleading receives no protection and the State may prohibit it entirely. *In re R. M. J.,* 455 U.S. 191, 203 (1982); *Pub. Citizen*, 632 F.3d at 218. The Supreme Court's opinions in *In re R.M.J.* and *Peel* set forth the difference between actually and inherently misleading commercial speech. See *Joe Conte Toyota, Inc. v. Louisiana Motor Vehicle Comm'n*, 24 F.3d 754, 756 (5th Cir. 1994) (discussing *In re R.M.J.* and *Peel*). Inherently misleading commercial speech exists when "the information imparted to customers is inherently conducive to deception and coercion" and for which no evidence of actual deception is necessary. *Joe Conte Toyota, Inc.*, 24 F.3d at 756 (internal quotation omitted). Actually misleading commercial speech exists when there is evidence that the public is actually "misled by the statement." *Id*. at 756; see also *In re R. M. J*., 455 U.S. at 202, 203 (actually misleading includes speech that "has in fact been deceptive" or "when experience has proved that in fact such advertising is subject to abuse"). As the Fifth Circuit has summarized: "a statement is actually or inherently misleading when it deceives or is inherently likely to deceive." *Joe Conte Toyota, Inc*., 24 F.3d at  756. Neither is entitled to First Amendment protection and may be prohibited outright. See *In re R.M.J*., 455 U.S. at 202; *Pub. Citizen Inc*., 632 F.3d

13

at 218.

### EOC's Use of the Business Name "Tire Engineers" is Inherently Misleading.

Whether commercial speech is "inherently likely to deceive" is a question of law for which evidence that any person has been deceived is not required. See *Joe Conte Toyota, Inc.*, 24 F.3d at 756, 757; see also *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 652–53 (1985) (relying on "commonplace" knowledge and holding that "[w]hen the possibility of deception is as self-evident . . ., we need not require the State to 'conduct a survey of the ... public' "); *Accountant's Soc. of Virginia v. Bowman*, 860 F.2d 602, 605-606 (4th Cir. 1988) (same). The Fifth Circuit's test is particularly instructive here: commercial speech which "[d]oes not mean what it appears to mean" is inherently likely to deceive, is not protected by the First Amendment, and is properly subject to prohibition. *Joe Conte Toyota, Inc.*, 24 F.3d at 757.

The parties agree that there are engineers who have specialized knowledge and experience working with tires. It is evidenced by the Board and factually undisputed by EOC that engineers who have specialized knowledge and experience with tires are publically known and referred to as "tire engineers." Despite its business name "Tire Engineers," and despite its website's advertisement that "Tire Engineers have tire engineers," EOC acknowledges that it does not employ tire engineers. For the reasons set forth below, the Court finds that EOC's use of the business name "Tire Engineers" is "inherently likely to deceive" Mississippi consumers to believe that the services performed at Tire Engineers are performed by tire engineers or under the supervision of tire engineers. That EOC's own website stated that "Tire Engineers have tire engineers

14

who are qualified to" service customers' tires clearly ties and equates its business name "Tire Engineers" with individual "tire engineers" and underscores the inherently misleading nature of its business name. "Tire Engineers" as a business is holding itself out to the public as something it is not: tire engineers.

EOC contends that its business name "Tire Engineers" is not inherently likely to deceive the public because "engineers" is a generic term which does not always refer to actual engineers; however, whether the Mississippi's statute is unconstitutionally applied to EOC requires analysis of specific use of the word engineer by EOC. *See Joe Conte Toyota, Inc.*, 24 F.3d at 756 ("Ample evidence in the record supports the conclusion that the term 'invoice' as used in the proposed advertisement at a minimum is likely to deceive and is therefore inherently misleading."). That the term "engineer" has other, generic uses which might not be misleading and which would be protected commercial speech does not establish that the term "tire engineers" when used by a store which sells and repairs tires is not inherently misleading.

The Board has presented evidence that tire engineers have specific and advanced knowledge – and often communicate this knowledge to the general public – regarding proper tire inflation[10], how to choose the proper tire for a vehicle[11], how to choose the proper tire for the season[12], and using tires for better gas mileage[13].Tire engineers also

---

[10] Even National Public Radio's vaunted automobile experts "Click and Clack the Tappet Brothers" located an actual tire engineer to answer a question about tire pressure. See Tom Magliozzi and Ray Magliozzi, Can Tire Pressure Rise On Its Own?, Denver Post, Sept.29, 2007 at BOE100, Ex. C.

[11] Jay Kopycinksi, Cooper Offers Off-Road Tire Tech, www.fourwheeler.com, April 24, 2016 at BOE138, Ex. C ("We spoke with Ken Reuille, Lead SUV & RLT Tire Engineer for Cooper Tire . . . [about] how we choose and use tires off-road.")

[12] Jeff Melnychuk, All-season tires aren't ideal in any condition, Newsday, Dec. 10, 2012 at BOE189, Ex. C ("Bill Vandewater knows. As one of Bridgestone's tire engineers, he talks about tread compound, gripping edges, siping and aspect ratio around the water cooler at work like the rest of us talk about last night's game or the local news.").

communicate to the general public specialized knowledge regarding when and how tires can be safely repaired or when a tire must be replaced rather than repaired[14]. As one court has noted, tire engineers "school[] industry personnel on the proper use, maintenance and repair of tires*." Montgomery Ward & Co. v. Gregg*, 554 N.E.2d 1145, 1159 (Ind. Ct. App. 1990). EOC did not present evidence to the contrary.

The Board has also submitted substantial evidence that the term "tire engineers" is used by courts, universities, tire manufacturers, automobile manufacturers, general periodicals, specialized periodicals, and the general public to refer to actual engineers who have expertise in the manufacture, selection, and repair of tires. Courts use the same descriptive term utilized by EOC, calling these actual engineers by the title "tire engineers." *See, e.g., Peterson v. Ress Enterprises, Inc.,* 686 N.E.2d 631, 636 (Ill. App. Ct. 1997) ("James Gardner, a tire engineer employed by Firestone Tire Co."); *Montgomery Ward & Co*., 554 N.E.2d at 1159 ("Forney holds a bachelor of science degree in mechanical and industrial engineering. He spent six years working for Firestone as a tire engineer. . . ."). Widely read periodicals like the New York Times and specialized media like "Today's Trucking" and "Fourwheeler.com" use the phrase tire engineer to refer to actual tire engineers and quote the guidance and expertise of these tire engineers in articles[15]. Even "Consumer Reports," which is known as an

---

[13] Ann Carrns, A Tire Engineer's Tips for Better Gas Mileage, N.Y. Times, April 25, 2011 at BOE148, Ex. C.
[14] Dave Nesseth, Is it time for a new tire repair provider? Find out, Today's Trucking, Sept. 21, 2016 at BOE196, Ex. C ("Gary Tatum, formerly a senior tire engineer at Goodyear for 35 years, has some tips about evaluating the quality of your tire repair provider."); U.S. Forensics Website at BOE246, Ex. F ("Our tire engineer has qualified as an expert in Federal courts . . . . We can determine if a tire failed due to manufacturer defect, poor maintenance, or improper repair.")
[15] See  supra notes 5, 6, 7, 8.

independent, "well-respected, third-party magazine that tests products[16]," boasts that it uses "tire engineers" to conduct its tire related testing[17]. Tire manufacturers use actual tire engineers in the public marketing of their tires[18] [19].

The use of the term "tire engineer" to refer to actual tire engineers is also seen in EOC's Mississippi market. The University of Mississippi's newspaper The Oxford Eagle published a story in 2017 profiling a chemical engineering alumnus hired as "a tire engineer in the technical department" at the Cooper Tire's manufacturing plant in Tupelo, Mississippi[20]. Cooper Tire itself sends tire engineers into middle school classrooms in Mississippi and other states to encourage students' interest in engineering[21].

The overlap between Tire Engineers as a business name and actual tire engineers is obvious. If consumers access www.tireengineer.com, they are directed to the website of an actual, licensed tire engineer. [See Carlson Engineering, Ex. I.] If consumers access www.tireengineers.com[22], they are directed to EOC's website. Actual tire engineers have specialized knowledge in the areas of tire repair and tire selection. Tire Engineers's website states that "Tire Engineers have tire engineers who are qualified" to service

---

[16] *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1324 (S.D. Fla. 2007).

[17] See Consumer Reports, How Consumer Reports auto information is different, www.consumerreports.org, February 2015 at BOE186, Ex. G.

[18] See Conti rolls out all-season General Altimax, Tire Business, May 3, 2013 at BOE192, Ex. C (" ' Our tire engineers have combined several technologies to give the consumer an all-season touring tire that is a notable value,'. . .").

[19] See TV News Desk, 'Modern Family's Julie Bowen Headlines New Bridgestone Tire Ad Campaign, Broadway World, May 15, 2014 at  , Ex. C (BOE151-154) (ad "features Bowen on an everyday adventure with a tire engineer from Bridgestone." "The advertisements, which are designed to appeal to women, mothers and safety-minded drivers . . .").

[20] See Edwin Smith, Engineers chart their own course in a 'a man's world', The Oxford Eagle, Jan. 22, 2017 at BOE133, Ex. C.

[21] See Chris Sweeney, Cooper Tire ambassadors look to inspire students, Rubber News, Feb. 10, 2017 at BOE125-BOE126, Ex. C.

[22] The "s" added to "tire engineer" directs customers to EOC's website, where their tire services and maintenance centers are advertised.

customers' tire needs and touts that its employees are "trained to inspect for any problems and to make necessary repairs" and can also "recommend the best tire brands for your vehicle[23]." [See Exhibit A, EOC Website at BOE223 (emphasis supplied), BOE226, BOE238.]

In response, EOC contends that the business name "Tire Engineers" is not inherently likely to deceive because it is unaware of a customer in Mississippi being deceived. EOC, however, has conceded that neither the company nor its witness, Josh Henderson, has surveyed whether consumers are deceived by EOC's business name. That Henderson, or EOC as a corporation, is unaware of a Mississippi customer who has lodged an actual complaint with EOC does not create a factual dispute regarding whether a large number of customers in fact have been deceived, or are inherently likely to be deceived.

EOC also contends that conclusions of officials from other states establish that the business name "Tire Engineers" is not inherently likely to deceive. Attached to EOC's Amended Complaint [Dkt. No. 8] is a letter, email, or opinion from the States of Alabama, Florida, Georgia, North Carolina, South Carolina, Tennessee, and Virginia[24].

---

[23] There are other considerations supporting the legal conclusion that the use of the business name "Tire Engineers" is inherently likely to deceive. While actual evidence of deception is unnecessary for a finding that of inherently misleading, see Joe Conte Toyota, Inc., 24 F.3d at 756, in this matter the inherently misleading nature of the business name is supported by the public opinion poll of Mississippi consumers commissioned by the Board. As discussed in more detail below, the Board commissioned Jackson State University's Institute of Government, with its partner the Center for Research and Public Policy, Inc., to conduct a telephonic public opinion poll of 400 Mississippi respondents between January 6-19, 2017. [See Mississippi Public Opinion Poll Report, at 3 Ex. K.] "The poll was designed to assess public views, expectations, perceptions and anticipated skill levels associated with" Tire Engineers as a business in Mississippi. [Id. at 4.] Among other relevant results, 70.5% strongly agreed or somewhat agreed that a company providing tire services such as sales, tire rotation, wheel balancing, alignments, and tire repair which uses the business name "Tire Engineers" is suggesting that it has professional engineers on its staff.

[24] The Court assumes these documents to be admissible for the truth of the matters contained therein for

18

Pursuant to the proposed pretrial order, at the bench trial of this matter EOC would submit these same documents as exhibits and call one fact witness, Henderson, who is an employee of EOC[25].

This Court has had the benefit of studying the affidavit submitted by Henderson in connection with summary judgment and which EOC intends to offer as an exhibit at the bench trial. EOC will not call any of the officials from these other states as witnesses. Under these circumstances, the Court "has somewhat greater discretion to consider what weight it will accord the evidence in a bench trial than in a jury trial." *Matter of Placid Oil Co.*, 932 F.2d at 397.  If there are neither issues of credibility nor controversies with respect to the substance of the proposed evidence, and a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge should draw his inferences without resort to the expense of trial. *Id.* at 397–98 (citing *Nunez*, 572 F.2d at  1124). When this Court ordered supplemental briefing on the appropriate weight to be afforded the materials from other states, no party suggested that the bench trial was necessary for this Court to evaluate and weigh the conclusions and opinions within these documents. Both parties continued to advocate for summary judgment. The Court has carefully studied the documents from other states submitted by EOC and finds them to be conclusory and generally unpersuasive, especially in light of the undisputed and specific facts placed before this Court. The Court finds the written and oral submissions by EOC and the Mississippi Board to be much more detailed and relevant to the First Amendment question pending before this Court.

Specifically, EOC submits an email from a Florida investigator stating that "it is

---

purposes of summary judgment.
[25] [See Exhibit 9 to supplement (Dkt. 48)].

quite obvious from a review of" Tire Engineer's website that it "does not offer professional engineering services." This individual's opinion of the website in April 2015 predated EOC's inclusion of the statement in August 2015 that "Tire Engineers have tire engineers qualified" to service customers' tire needs[26]. There is no indication in the email that the relevant Florida Board considered the issue.

A letter from the Georgia Board states that "based on the information provided to the Board," the Board "did not determine a possible violation of the licensure requirements sufficient for disciplinary action in this case" and that the issue would be considered "if additional complaints were received." The letter does not indicate what information it considered or the nature of the complaint.  That the letter advised EOC to consult "a court of appropriate jurisdiction to determine what civil remedies may be available" does not indicate that the Board reviewed whether the business name "Tire Engineers" violated Georgia law or was is misleading.

EOC has submitted minutes from a 2014 meeting of an Alabama regulatory Board. The Alabama Board's primary conclusion was that Alabama law did not apply to the business name "Tire Engineers" because it was grandfathered-in under the state statute. The Board then included the conclusory statement: "It is also agreed that the title Express Oil Change/Tire Engineers does not tend to convey the impression that the firm or individuals are professional engineers or that the firm is offering engineering." The Board did not indicate that its opinion was based on any evidence, investigation, or particularized analysis. The Board did not indicate it had surveyed the mental

---

[26] According to the parties' proposed pretrial order, EOC has stipulated that its website contained that statement from August 2015 until it was removed on September 1, 2017, four days prior to the combined summary judgment argument and pretrial conference.

impressions of consumers. The Board's meeting occurred before EOC began to advertise that "Tire Engineers have tire engineers qualified" to perform tire related services.

This Court gives the most serious consideration to the orders from North Carolina and South Carolina. The North Carolina Board concluded in May 2015 that the name "Tire Engineers" violated state law restricting the use of the term engineer by non-engineers. Less than thirty days later, the Board reached the opposition conclusion. The Board did not indicate what facts it considered or found persuasive. The Board's decision does not indicate that it undertook an independent investigator nor does it explain why its previous conclusion was incorrect. The Board did not indicate it had surveyed the mental impressions of consumers. Finally, the Board's conclusory statement that Tire Engineers was not "impl[ing] or represent[ing] professional engineering status or experience" predates EOC's advertisement that "Tire Engineers have tire engineers qualified" to perform tire related services.

In May 2015, the South Carolina Board conducted a hearing at which representatives of EOC appeared. At the conclusion of the hearing, the South Carolina Board concluded that the use of the name Tire Engineers" violated state law. EOC then submitted a letter requesting reconsideration based on North Carolina's reversal of its previous denial. Two months later, the South Carolina Board contradicted its previous position and found the business name "Tire Engineers" not to violate state law based in large part on North Carolina's reversal and EOC's representation that "no individual in Express Oil Change/Tire Engineers is currently titled as an 'engineer,' called an 'engineer,' or referred to as an 'engineer.' " The Board's order on reconsideration indicates that the order "shall be voided in the event that any employee of EOC is titled

21

as an 'engineer' or referred to as an 'engineer.' " (emphasis supplied).

Several problems are presented by EOC's reliance on the South Carolina Board's conclusion. First, there is no indication that South Carolina conducted a public opinion poll to measure whether its citizens are actually misled by the business name "Tire Engineers." Secondly, the Board's limited analysis is premised on the allegation that EOC did not – at the time – refer to any of its employees as an engineer. Shortly afterwards, however, South Carolina met in July 2015 to considered EOC's request for reconsideration, EOC began publically referring to its employees as tire engineers on its website: "Tire Engineers have tire engineers." Thirdly, EOC has had the same opportunity to present to this Court any evidence and applicable legal authority it presented to the South Carolina Board. And, this Court has the added benefit of reviewing the submissions from the Mississippi Board of Licensure for Professional Engineers. This Court is in the position to reach its own legal conclusion regarding whether the use of the business name "Tire Engineers" is inherently likely to deceive under First Amendment jurisprudence.

The Virginia Board's letter states that it relied on "correspondence" from EOC and the conclusion of the Alabama Board to arrive at the conclusion that the business name "Tire Engineers" would not "indicate or imply the practice of engineering." The Virginia Board does not set forth the evidence or analysis used to arrive at its conclusion. This Court has the benefit of reviewing the extensive submissions of both EOC and the Mississippi Board.

The letter from an official in Tennessee is dated Monday, February 23, 2015, and is written in response to a letter from EOC dated Friday, February 20, 2015.  There is no

22

indication that Tennessee Board itself investigated or reached any conclusion over that particular weekend. The letter's opinion that "a reasonable person would not conclude" that Tire Engineers is "performing professional engineering services" is unexplained speculation by the executive director, is not the kind of testimony credited by courts, is contradicted by the Mississippi Board's January 2017 survey of 400 Mississippians, and predates EOC's advertisement that "Tire Engineers have tire engineers."

Because no witnesses from these states will testify in this matter, the Court finds that a bench trial would not enhance the Court's ability to draw inferences and conclusions regarding the weight of the materials from other states in comparison to the undisputed facts placed before the Court by the parties. Both parties agree that there are tire engineers who have particular skill and expertise with respect to tire manufacturing, selection, and repair. EOC has placed no evidence in the summary judgment record disputing that the term "tire engineers" is used by courts, universities, tire manufacturers, automobile manufacturers, general periodicals, specialized periodicals, and the general public to refer to actual tire engineers. EOC has not provided an example of the term "tire engineer" being used to refer to anyone other than an actual tire engineer, with the exception of its own use of the term. EOC does not dispute that www.tireengineer.com is the website of an actual engineer while www.tireengineers.com is EOC's website. EOC does not dispute that from August 2015 until September 2017, EOC's website advertised that "Tire Engineers have tire engineers qualified" to service tires so as to clearly equate its business name "Tire Engineers" with individual tire engineers. The Court finds that ample undisputed evidence in the record supports the conclusion that EOC's use of its business name "Tire Engineers", "at a minimum, is likely to deceive and is, therefore, inherently misleading." *See Joe Conte*

*Toyota, Inc.,* 24 F.3d at 756.

The Fourth Circuit, in an instructive case, affirmed the constitutionality of Virginia's regulation prohibiting a non-certified public accountant from "describ[ing] himself as or assum[ing]" any of several "titles or designations," including "certified public accountant, CPA, public accountant, PA, certified accountant, CA, chartered accountant, licensed accountant, LA, registered accountant, RA, independent auditor, or auditor." *Accountant's Soc. of Virginia v. Bowman*, 860 F.2d 602, 605 (4th Cir. 1988). The Fourth Circuit found that the use of words "public accountant" and "PA" are business or trade labels, analogous to advertising. *Id*.

> The state has an interest in assuring the public that only persons who have demonstrated their qualifications as certified public accountants and received a license can hold themselves out as certified public accountants. The Supreme Court has held that "advertising for professional services" may be prohibited "when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse." R.M.J., 455 U.S. at 203, 102 S.Ct. at 937. We believe that use of the title "public accountant" by a non-CPA fairly could be characterized as inherently misleading, given the possibility, accurately stated by the district court, that "some members of the public would believe the title ... has the state's imprimatur."

> The similarity of the title "public accountant" to "certified public accountant" is self-evident. In defining "misleading" for the purpose of the regulation of commercial speech, the Supreme Court has explained that when the possibility of deception is self-evident, the state need not survey the public. Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 652-53, 105 S.Ct. 2265, 2282-83, 85 L.Ed.2d 652 (1985). Accordingly, the Board was not required to make an elaborate evidentiary showing at trial in order to establish the misleading nature of the regulated speech. The ban on the use of "public accountant" or "PA" by unlicensed accountants, in § 54-102.31(B), is a constitutionally permissible regulation of misleading commercial speech, as the district court correctly held.

*Id*. at 605–06; see Miss. Code Ann. § 73-13-1, et seq. (regulating and licensing

engineers); see also *Maceluch v. Wysong*, 680 F.2d 1062, 1069 (5th Cir. 1982) (term "M.D." had become synonymous in the public's mind with qualified, licensed physicians, such that the use of the term by non-physicians was not protected by the First Amendment).

Mississippi has an interest in assuring the public that only persons who have demonstrated their qualifications as engineers can hold themselves out engineers. EOC's use of the business name "Tire Engineers" is "likely to deceive" because it "does not mean what it appears to mean." *See Joe Conte Toyota, Inc*., 24 F.3d at 757.

### In the Alternative, EOC's Use of the Business Name "Tire Engineers" is Actually Misleading.

In addition to being inherently misleading, the Court separately finds that EOC's use of "Tire Engineers" is also actually misleading to Mississippi consumers and is not protected by the First Amendment. In this matter, the Board commissioned a scientific, professional public opinion poll to measure whether Mississippians are actually misled by EOC's use of the business name "Tire Engineers." Such survey evidence is an excepted method to establish commercial speech as misleading. *See Simm*, 2002 WL 257688, at *5; *see also Pub. Citizen Inc*., 632 F.3d at 225; cf. *Zauderer*, 471 U.S. at 652 (holding that if deception is self-evident, the State does not need to "conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead").

As noted above, testimony about the mental impressions of consumers requires expert testimony because "[m]eaningful opinion about consumer impressions requires some scientific, technical, or statistical basis in fact." *Tyco Healthcare Grp. LP v.*

25

*Kimberly-Clark Corp.*, 463 F. Supp. 2d 127, 131 (D. Mass. 2006) (finding that "[l]ay opinion of consumers' mental impressions is problematic;" striking statements from affidavit); see also *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254–55 (9th Cir. 1982) (citing Fed. R. Evid. 701). In this matter, only the Board has submitted expert testimony regarding whether Mississippi consumers are actually misled by the business name "Tire Engineers."

The Board commissioned Jackson State University's Institute of Government, with its partner the Center for Research and Public Policy, Inc., to conduct a telephonic public opinion poll of 400 Mississippi respondents between January 6-19, 2017. [See Mississippi Public Opinion Poll Report, at 3 Ex. K.] The survey was directed by the Center's president Jerry C. Lindsley, who was designated by the Board as an expert witness. "The poll was designed to assess public views, expectations, perceptions and anticipated skill levels associated with" Tire Engineers as a business in Mississippi. [*Id.* at 4.] The poll has a margin of error of +/- 5.0% . [*Id.* at 6.] The survey results evidence that Mississippians are actually misled as to whether "Tire Engineers" as a company uses actual tire engineers to perform its services, is offering engineering services, and/or performs its work with the level of skill and training of an actual engineer.

The survey screened participants to ensure that each was a resident of Mississippi, currently owned or leased a vehicle, was 18 years or older, and was not an employee of Tire Engineers. Survey participants were informed that the survey pertained to a company named "Tire Engineers" which provided tire services, such as sales, tire rotation, wheel balancing, alignments, and tire repair. [See Exhibit K at 30, 31 Dkt. No. 22-11].

The results of the survey clearly establish that Mississippians are actually misled by the business name "Tire Engineers." Almost half of the respondents (47.8%) believed that a company that uses the name "Tire Engineers" performs engineering services for tires. When asked "Do you expect and believe that a company which calls itself 'Tire Engineers' would have licensed professional engineers performing services for you and the public?" – 58.8% said yes. A majority of respondents (70.5%) strongly agreed or somewhat agreed that by using the name "Tire Engineers", the company is suggesting it has professional engineers on its staff. A majority of respondents (52.3% ) strongly agreed or somewhat agreed that by using the name "Tire Engineers", the company is suggesting the work on a vehicle is done by engineers. A majority of respondents (61.5%) strongly agreed or somewhat agreed that by using the name "Tire Engineers", the company is suggesting the company utilizes engineers to provide services to its customers. A majority of respondents (57.3%) strongly agreed or somewhat agreed that by using the name "Tire Engineers", the company is suggesting it is legally qualified to engage in the practice of engineering.

EOC's submissions do not create a disputed material fact regarding whether Mississippi consumer are actually misled. Without an expert witness, EOC concedes that it has no measurement of the impressions of Mississippi consumers. EOC simply asserts that it is unaware of any consumer who has been misled. Accordingly, given that EOC has not undertaken any effort to measure the impressions of Mississippi consumers, its alleged unawareness of customers being misled does not create a disputed material fact regarding whether a significant number of consumers are indeed misled as evidenced by the Board's survey.

EOC contends that the survey is entitled to no weight because the participants in the telephonic survey were not shown a picture of a Tire Engineers location[27]. EOC speculates that the results of the survey would have been different, and respondents would have not equated Tire Engineers with tire engineers, had respondents been polled in a face-to-face method which included a photograph of a Tire Engineers location. EOC's argument, if correct, would necessarily exclude any telephonic surveys. This Court stands by its observations appearing at page seven (7) of this Opinion and Order.

Finally, EOC argues that the materials from the other state regulatory authorities establish that Mississippi consumers are not actually misled. This Court disagrees. None of the materials from the other states indicates that those states performed a survey (scientifically sound or otherwise) of their own consumers and certainly not a survey of Mississippi consumers.

The Mississippi Board's survey confirmed that Mississippi consumers are actually deceived by the business name "Tire Engineers." Almost half of the respondents believed that "Tire Engineers" performs engineering services for tires. Over half of the respondents believed that 'Tire Engineers" had "licensed professional engineers performing services for you and the public." Since EOC has submitted no survey of Mississippi consumers, this Court is persuaded here that EOC has not shown the existence of disputed material facts pertaining to impression of Mississippi consumers; accordingly, the Board is entitled to summary judgment on this basis.

> In the Alternative, EOC's Use Of "Tire Engineers" is Potentially Misleading and the State's Restriction Passes the Applicable Level of Review under *Central Hudson*.

---

[27] This objection is also discussed in p. 7 of this opinion.

While EOC's use of the name "Tire Engineers" is inherently misleading and/or actually misleading so as to be afforded no First Amendment protection, in the alternative, this Court also finds that the business name is at least "potentially misleading." Potentially misleading commercial speech has limited constitutional protection. As trumpeted by *Central Hudson*, a regulation prohibiting potentially misleading commercial speech will pass constitutional muster if "the regulation directly advances a substantial government interest" and "is not more extensive than is necessary to serve that interest." *Pub. Citizen Inc.*, 632 F.3d at 218 (citing *Central Hudson*); see also *Simm*, 2002 WL 257688, at *3.

The *Central Hudson* test may be satisfied by direct evidence (such as the Board's opinion survey) which need not have existed at the time of enactment or through " 'history, consensus, and simple common sense.' " *See Pub. Citizen*, 632 F.3d at 220, 221 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)). With respect to the substantial interest, the Supreme Court has recognized as substantial the government's interests in "ensuring the accuracy of commercial information in the marketplace." *Pub. Citizen*, 632 F.3d at 220 (quoting *Edenfield v. Fane*, 507 U.S. 761, 769-70 (1993)). Additional substantial government interests exists when the regulation involves professions licensed by the state. The government has a substantial interest in "maintaining standards of ethical conduct in the licensed professions" and in the trust placed in those standards by the public. See *Pub. Citizen*, 632 F.3d at 220. For example, in *Florida Bar,* the Supreme Court held that restrictions on potentially misleading commercial speech can advance the state's substantial interest in "preventing the erosion of confidence in the [legal] profession." *Florida Bar*, 515 U.S. at 635; see also *Simm*,

2002 WL 257688, at *7 ("defendants have advanced a substantial state interest in support of the challenged regulation – preventing public confusion or deception about dentists' qualifications").

To satisfy that the regulation "directly advances" the substantial interest, the Board must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Pub. Citizen,* 632 F.3d at 220. The Board has satisfied that burden. The public opinion survey evidences the harm: Mississippians are misled to believe that "Tire Engineers" as a company (1) uses actual tire engineers to perform its services, (2) is offering engineering services, and/or (3) performs its work with the level of skill and training of an actual engineer. Prohibiting EOC from advertising itself as "Tire Engineers" would alleviate each of these three separate harms to a material degree.

Finally, the Board must show that the regulation is "not more extensive than is necessary to serve that interest." *Pub. Citizen*, 632 F.3d at 221. Importantly, "with commercial speech the state need not demonstrate that its regulatory means were the least intrusive on protected speech." *Pruett v. Harris Cty. Bail Bond Bd.*, 499 F.3d 403, 410 (5th Cir. 2007). As the Supreme Court has characterized the test: the "'fit' between the legislature's ends and the means chosen to accomplish those ends," need not be "necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.' " *Florida Bar,* 515 U.S. at 632 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

By prohibiting EOC from advertising itself using the name "Tire Engineers," the

State's restriction directly advances multiple substantial government interests and is a "reasonable fit" to accomplish the task. The public opinion poll establishes that a significant number of Mississippians are deceived by EOC's use of the name "Tire Engineers." The survey's findings are consistent with the generally accepted use of the term "Tire Engineers" to refer to actual tire engineers and is consistent with EOC's own website indicating that "Tire Engineers have tire engineers" to perform services. (Emphasis supplied) [EOC Website at BOE222, BOE223 (emphasis supplied), Ex. A.] Given that EOC does not employ tire engineers, the most direct and appropriate manner to address the potentially misleading nature of EOC's advertisement is to prohibit EOC from using the name "Tire Engineers." *See Accountant's Soc. of Virginia*,  860 F.2d at 605 (affirming regulation prohibiting a non-certified public accountant from "describ[ing] himself as or assum[ing]" any of several "titles or designations," including "certified public accountant, CPA, public accountant, PA, certified accountant, CA, chartered accountant, licensed accountant, LA, registered accountant, RA, independent auditor, or auditor").

Prohibiting EOC from advertising themselves as "Tire Engineers" serves the additional and substantial government interest of maintaining the public's confidence in engineers as a licensed profession. The Supreme Court has recognized the State's increased interest in regulating advertisements of licenses professions. See e.g., *In re R. M. J.*, 455 U.S. at 202 ("advertising for professional services [is] especially susceptible to abuses that the States have a legitimate interest in controlling"). The danger, seen especially here, is that the public places trust in professionals such as engineers because the profession is licensed and regulated by the State. S*ee Accountant's Soc. of Virginia v.*

31

*Bowman*, 860 F.2d at 605 (non-CPA prohibited from using CPA designation because "some members of the public would believe the title ... has the state's imprimatur"); see Miss. Code Ann. § 73-13-1, et seq. (regulating and licensing engineers). The Board's survey confirmed that respondents believed a "tire engineer" has a higher level of "skills, training, and certification" compared to tire repairman, tire technician, tire mechanic, or a tire specialist. [See Survey at 9, Exhibit K]. When asked "Do you expect and believe that a company which calls itself 'Tire Engineers' would have licensed professional engineers performing services for you and the public?" – 58.8% said yes. [Id. at 22]. The licensing requirement and advertising restriction ensure that those who hold themselves out to the public as an engineer have met the minimum qualifications and are subject to continued oversight by the state. *See Simm,* 2002 WL 257688, at *7 ("substantial state interest in . . . preventing public confusion or deception about dentists' qualifications").

In Mississippi, the practice of engineering is highly regulated to protect the public's safety. See Miss. Code Ann. §§ 73-13-1; 73-13-15. Engineers must meet minimum education and other qualifications as well as conform to a code of ethics. See Miss. Code Ann. §§ 73-13-15; 73-13-37. Engineers are subject to disciplinary hearings and sanction by the Board for work which fails to meet the required standards. See Miss. Code Ann. §§ 73-13-15(h); 73-13-37. As the enabling legislation summarizes:

> In order to safeguard life, health, and property, and to promote the public welfare, any person or firm in either public or private capacity practicing or offering to practice engineering shall hereafter be required to submit evidence that the person or firm is qualified so to practice engineering and shall be licensed as hereinafter provided; . . . .

Miss. Code. Ann. § 73-13-1. EOC itself recognizes the public's connection between engineers and public safety, and exploits the connection through its business name and

advertisements. Its website states that "Tire Engineers have tire engineers" and invites the public to rely on its skill as tire engineers to protect the safety of customers' and the customers' family.

Prohibiting EOC from promoting itself as "Tire Engineers" addresses two harms. First, a majority of Mississippians believe that the work performed by EOC is of the same skill, judgment, and quality associated with licensed, professional engineers. [See Survey at 21, 22, Ex. K.] In fact, EOC's employees are not trained to the level of engineers, are not licensed by the State, are not subject to the code of ethics applicable to engineers and are not subject to oversight by the Board. Confusing "Tire Engineers" for actual engineers creates the unacceptable "possibility" that "some members of the public would believe the title ["Tire Engineers"]... has the state's imprimatur.' " *See Accountant's Soc. of Virginia*, 860 F.2d at 605.

Secondly, EOC's use of the name "Tire Engineers" and its description of its employees as "tire engineers" leads to confusion about the qualifications and skill of actual licensed engineers. Given that sizable, if not a majority, of Mississippians believe that EOC's employees are actual engineers, the State's ability to "maintaining standards of ethical conduct in the licensed profession[]" is degraded. *See Pub. Citizen*, 632 F.3d at 220; *see also Florida Bar*, 515 U.S. at 635 (state can restrict commercial speech to "prevent[] the erosion of confidence in the [legal] profession"). As the Ninth Circuit has explained:

> Under the Act, the use of these titles is limited to those who have demonstrated to an appropriate state authority their qualifications to practice the branch of engineering to which the titles refer. This is a means whereby the public can be assured that those with whom they deal have met the state's qualifications. If this be a limitation of free speech, as

Smith asserts, it is not a type of limitation prohibited by the federal constitution. *Smith v. State of Cal.*, 336 F.2d 530, 534 (9th Cir. 1964). "Those who invite the confidence of the public upon the theory that they are architects or engineers may be compelled to submit to such regulations as will guard the public against misapprehension." *State Bd. of Examiners for Architects & Engineers v. Standard Eng'g Co.*, 7 S.W.2d 47, 49 (Tenn. Sct. 1928).

Prohibiting EOC from operating under the business name "Tire Engineers" when it does not employ tire engineers, does not offer tire engineering services, and does not perform services with the level of skill and training of a tire engineer is a constitutionally permissible protection of the public and of the engineering profession similar to restrictions preventing persons from advertising themselves as a "public accountant," "M.D." or "attorney" when the person is neither a certified public accountant, medical doctor, or licensed to practice law. See *Accountant's Soc. of Virginia*, 860 F.2d at 605; *Maceluch*, 680 F.2d at 1064; *Smith*, 336 F.2d at 534.

<u>The Board is Entitled to Summary Judgment on EOC's Lanham Act Preemption Claim.</u>

EOC argues that application of Code Sections 73-13-1 and 73-13-39 to its use of "Tire Engineers" is preempted by the Lanham Act because the state law would force it to either alter its trademark or cease using it altogether, allegedly in contravention of 15 U.S.C. §§ 1121(b) and 1127. Specifically, EOC argues that the Lanham Act preempts state consumer protection laws when the misleading business name is a registered trademark. Having reviewed the arguments of the parties and relevant decisions, this Court disagrees. The Lanham Act does not preempt state consumer protection laws which prohibit misleading business names, even if the business name is contained within a trademark.

34

Consumer protection is an area historically reserved to the states' police power. *Chrysler Corp. v. Texas Motor Vehicle Comm'n*, 755 F.2d 1192, 1205 (5th Cir. 1985); *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990). When Congress legislates in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Pacific Gas & Electric Co. v. Energy Resources Comm'n*, 461 U.S. 190, 206 (1983) (quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Because the Lanham Act does not "expressly preempt state law" or otherwise "occupy the field," Lanham Act preemption is limited to the narrow doctrine of "conflict preemption." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 409 (9th Cir. 2015); *Attrezzi, LLC v. Maytag Corp.,* 436 F.3d 32, 41 (1st Cir. 2006)). In conflict preemption, there is a rebuttable presumption that the state law is valid that the challenger must overcome. *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005). In this respect, Lanham Act preemption is the "exception rather than the rule." *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 919 (7th Cir. 2007).

The intent of Congress in enacting the Lanham Act is limited, as is its preemptive effect.

> The purpose underlying any trade-mark statute is twofold.  One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get.  Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

*Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975); *Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 782  n. 15 (1992) (Stevens, J., concurring). "A number of courts have cited this language in assessing whether measures affecting—but not directly regulating—trademarks are preempted." *Int'l Franchise Ass'n*, 803 F.3d at 409. Relevant to this litigation, the Lanham Act protects trademark holder from a competitor's use of confusingly similar marks by "pirates and cheats."

Mississippi's Code sections 73-13-1 and 73-13-39 are not preempted by § 1127 because they do not authorize pirates or cheats to use EOC's trademark. EOC's exclusivity regarding the name "Tire Engineers" is maintained. These state statutes instead provide that if EOC's business name is misleading, neither EOC nor anyone else may use that name. The Lanham Act simply does not preempt state's consumer protection or professional licensing laws.  See *Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co.*, 615 F. Supp. 2d 432, 437 (D. Md. 2009), aff'd, 412 F. App'x 607 (4th Cir. 2011) (finding federal trademark law does not preempt Maryland's "broader consumer-oriented remedies provided by the common law of unfair competition"); *Barnett v. Maryland State Bd. of Dental Examiners*, 444 A.2d 1013, 1021-1022 (1982) (cited approvingly in *Marvin J. Perry, Inc*., 615 F. Supp. 2d at 437); John L. Reed, 8 Fordham Intell. Prop. Media & Ent. L.J. 223, 262–63 (1997) (discussing preemption and noting that "[i]f a violator's use of regulated words, titles, or designations is found to be misleading, such use may be prohibited regardless of any federal trademark registration."); see also *Int'l Franchise Ass'n, Inc. v. City of Seattle,* 803 F.3d at 409 (Lanham Act does not occupy the field of trademark law); *Attrezzi, LLC* , 436 F.3d at 41 ("It is settled that the Lanham Act does not in general preclude state unfair competition statutes"); *Sporty's Farm L.L.C. v. Sportsman's Market, Inc*., 202 F.3d 489, 500-501 (2nd Cir. 2000) (Lanham Act

does not preempt state unfair trade practices act).

Despite the numerous courts' finding that the Lanham Act does not preempt state consumer protection laws, EOC next contends that § 1121(b) of the Lanham Act requires a completely opposite finding of preemption.

Such is not the case. Section 1121(b) was added to the Lanham Act in 1982 to remedy a problem that arose from the efforts of states to dictate the actual physical appearance of trademarks. *See Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 14 (2nd Cir. 1999) (citing HR. Rep. No. 97-778, at 1 (1982)). Section 1121(b) of the Lanham Act provides in relevant part, "No State or other jurisdiction of the United States or any political subdivision or any agency thereof may require alteration of a registered mark. . . ." 15 U.S.C. § 1121(b); however, Section 1121(b) did not preempt a state's authority "to prohibit the use of a registered mark altogether." *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1298 (9th Cir. 1998); accord *Lisa's Party City, Inc*., 185 F.3d at 15. The legislative history of § 1121(b) confirms its limited purpose and limited reach. *See Payless ShoeSource, Inc. v. Town of Penfield, N.Y*., 934 F. Supp. 540, 545 (W.D.N.Y. 1996) (finding § 1121(b) did not preempt state aesthetic law; quoting legislative history that § 1121(b) "is not intended to limit the right of States to regulate signs or agreements merely because they may involve registered trademarks. It will not prevent States from prohibiting deceptive or misleading advertising and unfair competition.") Applying this reasoning, this Court concludes that Mississippi law does not require alteration of EOC's trademark; instead, the effect of the statute is to ban its use altogether due to its misleading nature.

At oral argument, EOC indicated that its primary authority supporting

37

preemption was *Beatrice Foods Co. v. State of Wisconsin*, No. 83-C-714-C, 1983 WL 44364 (W.D. Wis. Nov. 11, 1983). EOC's reliance on this unpublished, preliminary injunction opinion is misplaced because that court did not actually find state law to be preempted by the Lanham Act. *The Beatrice Foods Co*. court stated that the "only issue" it was resolving was the plaintiff's commerce clause claim. *Id*. at *6. The court added in dicta that the Lanham Act "seems directed at fact situations like that presented here." *Id*. (emphasis supplied). The court did not undertake an analysis of preemption and made no finding of preemption because, as it noted, "[t]he only issue I am considering is whether defendants have violated the commerce clause." *Id*. This Court agrees with subsequent decisions finding that the *Beatrice* court's "passing reference to plaintiff's federally-registered trademark is not persuasive." *Center for Environmental Health v. Advantage Research Laboratories, Inc*., 2011 WL 13146702 at *1-2 (Cal.Super. Dec. 13, 2011).

When analyzed under the narrow rubric of conflict preemption, the Lanham Act does not conflict with and preempt state consumer protection laws. "[T]he law is clear that the registration of a trademark does not create any substantive rights to perpetrate fraud upon the public." *Hearing Aid Ass'n of Ky., Inc. v. Bullock*, 413 F.Supp. 1032 (E.D. Ky. 1976) (citing *Armstrong Paint & Varnish Works v. Nu-Enamel Corp*., 305 U.S. 315 (1938)). EOC's preemption argument fails as a matter of law.

38

<u>CONCLUSION</u>

The Court, having heard oral argument on this matter and having reviewed all submissions by the parties, including relevant jurisprudence, hereby GRANTS Defendant's Motion for Summary Judgment [Docket No. 22]. All pending motions in this matter [Docket Nos. 24, 25, & 32] are moot. This case is hereby dismissed with prejudice. The Court will submit a Final Judgment in accordance with the local rules.

**SO ORDERED AND ADJUDGED**, this, the ___1st___ day of __February_____, 2018.

s/  HENRY T. WINGATE
**UNITED STATES DISTRICT COURT JUDGE**

39